**Opinion issued May 17, 2016**



In The

# Court of Appeals

### For The

## First District of Texas

———————————

### NO. 01-15-01045-CV

———————————

## IN THE INTEREST OF D. W., A CHILD

———————————

### On Appeal from the 306th District Court
### Galveston County, Texas
### Trial Court Case No. 14CP0057

———————————

## O P I N I O N

Following a jury trial, the trial court signed a judgment terminating the parent-child relationship between two-year-old D.W. and his parents, C.E. ("Mother") and S.W. ("Father"). On appeal, Mother raises three issues in which she contends (1) the trial court erred when it denied her request for a bench warrant to attend trial; (2) the trial court abused its discretion "when it disallowed" her "argument and presentation as to conservatorship issues," and (3) the Department

of Family and Protective Services ("the Department") was permitted to make improper jury argument. Father presents four issues in which he asserts (1) he was denied due process; (2) the trial court abused its discretion when it denied his motion for continuance; (3) he received ineffective assistance of counsel at trial; and (4) the trial court erred because it did not timely appoint appellate counsel to represent Father.

We reverse and remand in part and affirm in part.

## Background

On June 10, 2014, the Department filed suit, requesting the trial court to issue a temporary order appointing it as the temporary sole managing conservator of seven-month-old D.W. If family reunification could not be achieved, the Department sought to terminate Mother's and Father's parental rights to D.W. To support its petition, the Department offered the affidavit of its representative, Constance George, an investigator with the Department's Child Protective Services.

George stated that, on June 7, 2014, the Department received a report of "neglectful supervision" of D.W. by Mother and Father. On that day, the Galveston police had been called to the Children's Center, a homeless shelter. The report alleged that Mother and Father, who had been staying at the shelter with D.W., were using crystal meth.

Also on that day, the police and ambulance services were called to a local Galveston business because Mother was "causing a scene" at the business. D.W. was with Mother and bystanders were concerned that D.W. appeared dehydrated.

At the scene, Mother admitted to the responding police officer that she had used meth that week. She also admitted to manufacturing meth. George stated in the affidavit that Mother was arrested because the police found crystal meth on Mother.[1]

D.W. was taken to the hospital. George stated that D.W. was found to be "a little dehydrated." D.W. also had mosquito bites "all over his body" and had "been exposed to too much sun for his age." George also stated in her affidavit that Father had not been located and that D.W. was ready to be discharged from the hospital.

George also averred that, on June 9, 2014, she spoke with Mother, who was in the Galveston County Jail. Mother told George that she was originally from Pennsylvania. Mother indicated that she and Father left Pennsylvania because she was "facing a possibility of 10 to 20 years in jail [there], and she wanted to have enough time with [D.W.]" before she was sentenced. Mother told George that they passed through a number of states before arriving in Texas. They lived in Houston for about one month before coming to Galveston.

---

[1]     The responding police officer testified at trial that the substance found on Mother field-tested positive for cocaine, not crystal meth.

Mother told George that, one month earlier, she, Father, and D.W. had come to Galveston, planning to spend the weekend. They had gotten a ride to Galveston with some friends from Houston. Mother said that they had an argument with the friends, and the friends forced them out of the car. Mother, Father, and D.W. were stranded in Galveston. Mother told George that they lived under a bridge for one week before going to the Children's Center homeless shelter.

Mother told George that she was not a meth user, however, she admitted to being a "cooker" of meth; that is, someone who manufactured meth.[2] Mother said that, as part of her job as a cooker, she had to taste the meth to ensure that it was safe to sell. Mother stated that she had not cooked meth in D.W.'s presence. She told George that another couple at the shelter had agreed to sell the meth, if Mother and Father cooked it. Mother said that they had hoped the money they earned from the meth would help them get out of the shelter. Mother acknowledged that the police had recovered items used in manufacturing meth from their room at the shelter. Mother told George that she did not know where Father was.

George also stated in her affidavit that she had learned from police in Pennsylvania that Mother had pending charges in that state for marijuana possession and for manufacturing meth. She also had been told by Pennsylvania police that Mother may be extradited to Pennsylvania for the pending charges.

---

[2] Mother also admitted to George that she occasionally used marijuana.

4

On June 10, 2014, the trial court signed emergency temporary orders, naming the Department as D.W.'s temporary sole managing conservator. Because Mother and Father had no family in Texas, D.W. was placed in foster care.

The trial court appointed separate counsel to represent Mother and Father. As ordered by the trial court, Mother and Father and their counsel appeared at mediation on June 18, 2014. As a result of the mediation, they signed and agreed to follow a family service plan, which the trial court approved. Father also provided the name of his brother, C.W., who lived in Ohio, as a family member who could care for D.W.

Mother remained in jail in Galveston on charges of illegal drug possession. In August 2014, Mother pleaded guilty in Galveston County district court to the reduced charge of misdemeanor possession of drug paraphernalia and was sentenced to 140 days in jail. In September 2014, Mother was extradited to Pennsylvania on charges relating to the manufacturing of meth.

D.W. remained in foster care in Texas for five months. The Department determined that Father's brother, C.W., was a suitable placement for D.W., and D.W. went to live with C.W. in November 2014. D.W. remained in C.W.'s care during the pendency of the case.

Trial was set for May 18, 2015. On April 8, 2015, Mother filed a motion for continuance and to extend the statutory dismissal date for the suit. She averred that

she was incarcerated in Pennsylvania but hoped to be released by the end of 2015 to attend trial in Galveston. On April 16, 2015, the trial court granted Mother's motion, setting a new trial date of November 30, 2015. The order also provided that, pursuant to Texas Family Code section 263.401(b)(1), the suit would be dismissed unless a final order was rendered by December 12, 2015.

Although no order is contained in the record, on June 26, 2015, the trial court coordinator made a notation in the case-summary record, indicating that Father's counsel, who had been appointed in June 2014, was "removed from the case" and that new counsel was appointed to represent Father.

On August 13, 2015, a permanency hearing was held, which was attended by Mother's and Father's counsel. During the first year of the case, Father had attended mediation, a status hearing, two permanency hearings, and pre-trial mediation with his previous counsel; however, Father did not attend the August 13 permanency hearing with his newly appointed counsel.

Father was arrested in Galveston County on October 16, 2015. He waived extradition to Pennsylvania on October 21, 2015, to face charges related to manufacturing and possession of a controlled substance.

Mother filed a motion for bench warrant on November 3, 2015, stating that she was incarcerated in Pennsylvania and wished to be present for the jury trial on November 30, 2015. Mother asserted that her "presence is necessary to assure due

process in the proceeding." She requested the trial court to issue a bench warrant for her attendance, or, "in the alternative," Mother requested she be permitted to attend trial "via video or conferencing technology so that she may be present and aware of the court proceedings and provide the necessary communications with her attorney to ensure her right to due process is preserved."

The trial court granted Mother's motion in part. The trial court ordered that Mother "be allowed to appear at the trial so that she may fully participate in the proceedings." The court further ordered that Mother's "appearance [be] secured via video conferencing technology so that she may be present and aware of the court proceedings and that [Mother be] provided the necessary ability to perceive the proceedings and communicate with her attorney to ensure her right to due process is preserved."

A pre-trial conference was held on November 20, 2015. Mother's attorney reminded the trial court that Mother would be appearing at trial via videoconference. The trial court asked Mother's attorney, "So . . . we're going to do a jury trial with a talking head?" Mother's attorney responded,

> I have asked my client repeatedly and she's been adamant that she wanted a jury. Obviously, there will be a few accommodations I may have to ask for, like maybe taking a short break after witnesses to confer before crossing; but other than that, I still anticipate we will be done in three days.

Substitute counsel appeared at the pretrial hearing on behalf of Father's appointed counsel, but substitute counsel said little. The trial court asked substitute counsel, "And you don't know anything?" Substitute counsel stated, "I don't know anything. I just got a text from [appointed counsel]."

At that point, the Department's counsel informed the trial court:

I can tell you we recently learned that [Father] was extradited, as well, to Pennsylvania; but I don't know if anybody has been able to determine where he might be. [Mother's counsel] and I discussed that; and she said it actually took her client four to six weeks to get to Pennsylvania. So we have no idea where he's at at this point. He was released from Galveston County Jail, I think, October 21st or somewhere around there. That is when the extradition papers were signed.

The trial court asked if Father had previously appeared, and the Department's counsel confirmed that he had. The trial court then stated, "All right. I guess if there's any challenges with that situation, we will just have to deal with that then."

Trial began on November 30, 2015. That morning, Father's counsel filed a verified motion for continuance with the trial court. In the motion, Father's counsel averred:

This attorney has been unable to contact her client. On November 16, 2015 the CPS attorney sent an email that my client [Father] might be in jail in Pennsylvania. I have learned what facility he is in but have been unsuccessful trying to reach a human to communicate with. I have been on hold for over an hour and have tried many days and cannot get through to a person at the facility. I am unable to contact my client to discuss his position on this case, what has transpired and

8

his responses to [the Department's] allegations, and his wishes for the child.

It is my understanding that the mother of the child is incarcerated (perhaps at the same facility as my client) and arrangements are being made so that she can participate in the trial by Skype and also have communications with her attorney through the trial. My client should be given the same opportunity to participate in this serious trial.

Also that morning, the trial court conducted a pretrial conference. At the hearing, Father's counsel brought the motion for continuance to the trial court's attention. Counsel informed the trial court of the following:

The real issue—and I'm hoping that maybe tech can help me. I was brought in this case, replacing [first-appointed attorney]. I have never had contact with my client. . . . I have not had contact with my client. It's my understanding that he is in the same penal institution that the mom is. I just recently found this out. I had an e-mail . . . from [the Department's counsel on November 16, 2015] that said that she thought that my client was in jail; and she said: "I'm assuming that he's been in—extradited to Pennsylvania because there's an extradition." I had no other contact information at that point. I got some information from the attorney from the mom. I did some research on the Internet. I located a phone number for the prison facility. I verified through their answering system that, yes, he was there.

It is a really strange phone system they've got. I have been on the phone for about an hour and a half trying to get to a human being at the phone number for this prison. I cannot get a human being's voice. . . . My real issue is: If the mother is able to be participating in the trial, I would think the father should have the same right. I don't know if there's a way that we can get through the contact that the attorney for the mom has to help us reach a human being to see if, at least, he could be available by voice. I don't care about the camera so much; but, at least, be able to hear what's happening [in] a trial as serious as this.

Father's attorney then suggested that the person at the Pennsylvania jail, who was facilitating Mother's appearance, could be contacted to determine if she could assist in getting Father on a speakerphone that afternoon for the start of trial. The trial court rejected that request, stating, "So, once again, it's the same thing. I'm not going to let them just hear and participate that way."

Father's attorney stated,

> [I]f you can do camera, that's great. . . . I'm not trying to make it complicated, but I think he should be able to, at least, hear what's going on in this trial. If we can do camera, that's fabulous. He should be able to hear what's happening in this trial; but I have no other way to do it and had short notice.

At the request of Father's attorney, Mother's attorney then described for the trial court the steps that she had taken to arrange for Mother to appear at trial by videoconference. Mother's attorney confirmed that the jail phone system was difficult to navigate. She stated that she remembered "tricking the system somehow" and was eventually put in contact with a Mother's "pod counselor," who facilitated her contacts with Mother. Mother's attorney stated that she was willing to share the counselor's direct contact information with Father's attorney.

At that point, the trial court indicated that an attempt would be made to facilitate Father's appearance by videoconference from the Pennsylvania correctional facility. The trial court stated, "We're going to start [trial]. We'll start today at 1:30; and they can be working on it from their end. And it may be that we

have to do some kind of split screen or something, but I'm going to hold them both to the same standard." The trial court's technology technician was present in the courtroom and informed the trial court that "[o]ur limitations are on the far side, which is Pennsylvania, whether or not we can get them set up with a laptop and webcam."

Later in the pre-trial hearing, the trial court indicated that the motion for continuance was denied, stating, "I am encouraging everybody to cooperate to try to get [Father] to be part of this; but we're not going to slow it down for it." Father's attorney then asked whether the trial court was denying the motion. The court stated, "Yes. That's what I was saying. It's denied, but I definitely want to help him be a part of this. So, hopefully, he's onboard by the time we're picking— start picking the jury; but if not, let's have him in when we get him."

Trial began that afternoon, and the jury was selected. Mother appeared from the Pennsylvania correctional facility by videoconference to allow her to see and hear what was happening in the courtroom, to confer with her attorney, and to testify.

The second day of trial, after the Department had presented several witnesses, the Department requested the record to reflect, outside the presence of the jury, that "we did attempt to have them both [parents] present; and it wasn't possible." The trial court stated,

11

So outside the hearing [of the jury], I'm putting on the record that we cannot have both of the respondents present by video because of the facility that they are at. No—nothing to do with our technical issues or our court system. So I'm just putting that on the record. Okay? We can't have both of them at the same time.

At the end of the third day of trial, the Department requested to call Father as a witness. Father's attorney objected on the basis that Father had not participated in the first two days of trial. Father's attorney stated,

I had asked for a continuance because I have not had the opportunity to talk to my client or to meet him; and I just discovered on November 16th, through an e-mail from the CPS attorney, that he was extradited. I tried to hunt him down. I have yet to be able to get through on the phone system on anything. So I don't think it's fair that we continue with the trial anyhow. And it would be unfair for the CPS attorney to be able to call him when I've never even had a chance to talk to him. That would deny him a chance of a fair trial or any advice from me as his attorney.

The Department's attorney responded, "I would just like to get on the record from respondent's counsel that that is a trial strategy on her part. She has made the decision not to call him herself."

Father's attorney replied, "I don't have to put on any case and I have not made a full decision, but I have a lot of issues about all of this. And I really don't want to have to go into a mistrial for the State to be calling him. He has not been able to participate in the trial."

The trial court ruled that it would permit the Department to call Father as a witness. Father's attorney continued her objection:

[Father] has not been allowed to participate in the trial. He's not been allowed to listen to any of testimony of any of the witnesses. I cannot ask him about anything that was not stated correctly of anybody else. The IT person has stated to us that it was impossible to be able to have both of these people—both parents participating in the trial at the same time.

So only one person has gotten to do that and that was the mother. The father was not allowed to do it because they didn't have the technical ability to do it. So it would be an unfair prejudice to him that he's been denied that, denied the right to attend as far as that goes. . . . [I]f he is to be called as a witness, which I'm fervently objecting to, if CPS were to call him, the CPS attorney spent over four hours in examining the mother on the stand. I have not had a chance to talk with him at all. I would have to have a chance to visit with him prior to him being on the stand, have a chance to update him on the several days of testimony and what has been transpiring here, as well as all the exhibits that have been admitted into evidence that I haven't had an opportunity to talk to him about. So I would need to have time to visit with him, which would be a delay for the Court.

The Department's attorney responded, "[T]here was no request by [Father's] counsel to alternate mother listening to some witnesses on one day and father listening to other witnesses on one day and there was certainly no objection or bar put on that by the petitioner." Mother's counsel then stated that she would not agree to that arrangement because it would prevent Mother from hearing the entirety of the proceedings.

Father's counsel made one last point:

And I need to throw one more thing out there, Judge, to put on the record: This Court has been very workable with the attorney for the mother. And you have tried to afford her the opportunity after every single witness has testified throughout the trial to be able to consult with her client. If you allow the CPS attorney to call my client, my

13

client has been denied that access to counsel, which has been afforded to the mother. . . . . I did not submit a witness list because I had no witnesses. I didn't even know exactly where my client was. I haven't had an opportunity to consult with him or to visit with him. . . . .

The next morning, the fourth day of trial, the Department abandoned its request to call Father to testify. Trial concluded at the end of the fourth day.

To support the termination of Mother's and Father's parental rights to D.W., the Department presented the following statutory predicate grounds to the jury: (1) both parents had knowingly placed or had knowingly allowed D.W. to remain in conditions or surroundings that endangered his physical or emotional wellbeing; (2) both parents had engaged in conduct or had knowingly placed D.W. with persons who engaged in conduct that endangered his physical or emotional wellbeing; (3) both parents had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain D.W.'s return; (4) Father had constructively abandoned D.W.; and (5) Mother had used a controlled substance in a manner that had endangered D.W. *See* TEX. FAM. CODE ANN. § 161.001(1)(b)(D),(E),(N),(O),(P) (Vernon 2014). The jury was also instructed that "it must be proven by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the child."

On fifth day of trial, Friday, December 4, 2015, the jury returned its verdict, finding that the parent-child relationship between Mother and D.W. and between

Father and D.W. should be terminated. The trial court stated on the record that it would render judgment based on the jury's verdict. The court also stated that the attorneys representing the parents would be released after the court signed the termination orders. Father's attorney indicated that she would be filing a notice of appeal and requested the trial court to wait on releasing counsel. The trial court stated that it would sign the final termination orders on Monday, December 7, 2015, to give the attorneys adequate time to file notices of appeal before releasing them. Mother's counsel filed a notice of appeal on December 7, 2015, the same day the judgment was signed. Father's counsel filed a notice of appeal on December 8, 2015. She also filed a motion to withdraw as Father's counsel. The trial court signed an order permitting Father's attorney to withdraw that same day.

Appellate counsel was not appointed to represent Father until December 30, 2015. On January 12, 2016, appellate counsel filed a motion for extension of time to file Father's brief in this Court. She stated that she had not received notice of her appointment to represent Father until January 6, 2016.

On appeal, Mother raises three issues. She contends (1) the trial court erred when it denied her request for a bench warrant to attend trial; (2) the trial court abused its discretion "when it disallowed" her "argument and presentation as to conservatorship issues," and (3) the Department was permitted to make improper jury argument.

Father presents four issues on appeal. He asserts (1) he was denied due process; (2) the trial court abused its discretion when it denied his motion for continuance; (3) he received ineffective assistance of counsel at trial; and (4) the trial court erred because it did not timely appoint appellate counsel to represent Father.

## Father's Appeal: Denial of Due Process

In his first issue, Father contends that he was denied due process of law under the United States Constitution and due course of law under the Texas Constitution. *See* U.S. CONST. amend. XIV, § 1 (providing that no State shall "deprive any person of life, liberty, or property without due process of law"); TEX. CONST. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.").[3] Father asserts that he was denied due process because he was not permitted to participate at trial in a meaningful manner as a result of the trial court's denial of his attorney's request for a continuance and the trial court's refusal to consider his participation at trial by teleconference.

---

[3] For claims of procedural due process, as here, the Supreme Court of Texas has found no meaningful distinction between Texas' due-course-of-law protection and the federal constitution's due process guarantee. *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995). In a due-course-of-law analysis, courts look to federal cases construing the guarantee of due process as persuasive authority. *NCAA v. Yeo*, 171 S.W.3d 863, 867–68 & 867 n.14 (Tex. 2005). We, therefore, conform our discussion to the claimed denial of due process under the United States Constitution. *See In re T.L.B.*, No. 07–07–00349–CV, 2008 WL 5245905, at *2 n.7 (Tex. App.—Amarillo Dec. 17, 2008, no pet.) (mem. op.).

16

## A.     Applicable Legal Principles

In analyzing a claim of deprivation of procedural due process, we apply a two-part test: (1) whether the complaining party has a liberty or property interest entitled to protection; and (2) if so, what process is due.  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S. Ct. 1148, 1153–54 (1982); *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995).  "[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard."  *Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S. Ct. 780, 785 (1971).

Parents have a fundamental liberty interest "in the care, custody, and management of their child."  *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394–95 (1982).  This fundamental liberty interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."  *Id.* at 753, 102 S. Ct. at 1395.  Moreover, status as a prison inmate does not strip a person of his constitutional right of reasonable access to the courts.  *In re T.L.B.*, No. 07–07–0349–CV, 2008 WL 5245905, at \*2 (Tex. App.—Amarillo Dec. 17, 2008, no pet.) (mem. op.) (citing *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S. Ct. 3194, 3198 (1984)).  Therefore, here, Father was entitled to procedural due process in the termination proceeding. *See In re*

17

*R.M.T.*, 352 S.W.3d 12, 17 (Tex. App.—Texarkana 2011, no pet.); *Martinez v. Tex. Dep't of Protective & Regulatory Servs.*, 116 S.W.3d 266, 271 (Tex. App.—El Paso 2003, pet. denied).

At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976). What process is due in any given situation is measured by a flexible standard that depends on the practical requirements of the circumstances. *Id.* at 334, 96 S. Ct. at 902. To assess what process Father was due, we weigh the three factors developed by the United States Supreme Court in *Eldridge*: (1) the private interest affected by the proceeding or official action; (2) the countervailing governmental interest supporting use of the challenged proceeding; and (3) the risk of an erroneous deprivation of the private interest due to the procedures used. *In re B.L.D.*, 113 S.W.3d 340, 352 (Tex. 2003) (citing *Eldridge*, 424 U.S. at 335, 96 S. Ct. at 903). Courts must weigh these factors to determine whether the fundamental requirements of due process have been met by affording an opportunity to be heard at a meaningful time and in a meaningful manner under the circumstances of the case. *See City of Los Angeles v. David*, 538 U.S. 715, 717, 123 S. Ct. 1895, 1896 (2003).

**B.** **Weighing of the *Eldridge* Factors**

   *1.* *Private Interests Affected by the Proceeding*

Concerning the private interests affected, parental rights are "far more precious than any property right," and when the State initiates a termination proceeding, "it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. at 1397. A parent's interest in maintaining custody of and raising his or her child is paramount. *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). For this reason, a parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one. *Id.*

The private interests of the child must also be considered. *Id.* "Both the parent and the child have a substantial interest in the accuracy and justice of a decision." *Id.* The considerations involved in this case—namely, Father's fundamental liberty interest in maintaining custody and control of D.W., the risk of permanent loss of the parent-child relationship between them, and Father's and D.W.'s interest in a just and accurate decision—weigh heavily in favor of providing Father with an opportunity to communicate with his attorney and participate in the termination proceedings, even if that required a continuance of trial and participation by teleconference. *See id.* at 548.

19

*2. The State's Interest in the Proceeding*

The State's interest in the proceeding includes protecting the best interest of the child, an interest which is "served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home." *M.S.*, 115 S.W.3d at 548–49; *see also B.L.D.*, 113 S.W.3d at 353 (noting that the State's "*parens patriae* interest in promoting the welfare of the child" aligns with the parent's interest in a just and accurate decision). The State also has an interest in an accelerated timetable and a final decision that is not "unduly prolonged" with negative psychological effects on the children left in limbo. *See M.S.*, 115 S.W.3d at 548; *see also B.L.D.*, 113 S.W.3d at 353. As has been recognized,

> [the] Family Code's entire statutory scheme for protecting children's welfare focuses on the child's best interest. *See, e.g.*, TEX. FAM. CODE §§ 51.11(b); 153.001; 153.002; 161.001(2); 161.101. And, like their parents, children have an interest in an accurate resolution and just decision in termination cases. But children also have a strong interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged.

*In re J.F.C.*, 96 S.W.3d 256, 304 (Tex. 2002) (Schneider, J., dissenting). The policy for expeditious determinations of termination cases is also apparent in Family Code Section 263.401, which governs how long a termination suit may remain pending before commencement of trial. Section 263.401(a) requires as follows:

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b–1), on the first Monday after the

first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

TEX. FAM. CODE ANN. § 263.401(a) (Vernon Supp. 2015).[4] The trial court may extend the deadline for dismissal for up to 180 days, and it must dismiss the suit if trial has not commenced on or before the new dismissal date. *Id.* § 263.401(b), (c).

The record shows that the Department was first appointed as temporary managing conservator of D.W. on June 10, 2014. Trial was set to commence on May 18, 2015. Later, pursuant to section 263.401(b) and at Mother's request, the trial court extended the dismissal date to December 12, 2015 and set trial for November 30, 2015.[5] Trial commenced on the morning of November 30, 2015 with the announcements of the parties and a determination of a number of preliminary evidentiary matters. *See In re D.S.*, 455 S.W.3d 750, 753 (Tex. App.—Amarillo 2015, no pet.) (suggesting that "commencement of trial" means, at a minimum, that the parties have been asked to make their respective

---

[4] The Texas Legislature amended Section 263.401 after this case was filed; however, we cite to the current version of the statute because the subsequent amendments do not affect our analysis in this appeal.

[5] The trial court's order stated that the case would be dismissed unless a final order was rendered by December 12, 2015. However, Section 263.401(b) provides that trial only need be *commenced* by the dismissal date. *See* TEX. FAM. CODE ANN. § 263.401(b) (Vernon Supp. 2015). It does not require that judgment be rendered by that date. *See id.*

announcements, and the trial court has ascertained whether there are any preliminary matters to be taken up). Thus, a short recess or continuance of the trial to permit Father's attorney to pursue contacting him in prison to confer with him and to prepare for trial would not have placed the case in jeopardy for dismissal. *See id.*

The record shows that the jail phone system was extremely difficult to maneuver. Father's attorney detailed for the trial court the efforts she had made to reach a live person at the jail through the phone system to no avail. Mother's attorney confirmed that the system was difficult to maneuver and stated that she had only gotten through it to reach a person at the jail when she discovered how to "trick" it. The record shows that Mother's attorney was willing to assist Father's attorney by providing the direct contact information for the person at the correctional facility who had assisted in setting up Mother's videoconferencing.

More importantly, permitting Father to participate in trial by telephone, as requested by his attorney, would not have placed the case in jeopardy of dismissal pursuant to Family Code Section 263.401(b). We note that, while he does not have an absolute right to appear personally in court in a civil case, an inmate may not be denied reasonable access to the courts. *See T.L.B.*, 2008 WL 5245905, at *3. Even though granting a continuance or permitting Father to participate by telephone may have increased the time that it took to resolve the case, "the State's interests in

economy and efficiency pale in comparison to the private interests at stake, and to the risk that a parent may be erroneously deprived of his or her parental rights and the child may be erroneously deprived of the parent's companionship." *M.S.*, 115 S.W.3d at 548.

In short, the record does not show that granting the motion for continuance or the request for Father to appear by telephone would have greatly harmed the State's interest in an efficient and economic resolution of this matter by placing the case at risk for dismissal. Concomitantly, the record does not show that granting Father's requests would have created a conflict between D.W.'s need for permanency and stability and Father's right to reasonable access to the court. *Cf. See R.M.T.,* 352 S.W.3d at 21 (holding that father's right to a continuance of termination trial based on his mental incompetency was in conflict with child's right to achieve permanency in a timely fashion when evidence showed that father would not achieve mental competency before case had to be statutorily dismissed). Nor does the record show that D.W.'s best interest was promoted by denying the requests of Father's attorney. *Cf. id.* Given the record, we give less weight to the Department's interest in this case to achieve an expeditious resolution than we give to the private parties' interests. *See M.S.*, 115 S.W.3d at 548; *see also T.L.B.*, 2008 WL 5245905, at *3 ("[C]oncerns for efficiency and economy are inferior to the private interest at stake as well as the risk of an erroneous termination decision.").

23

*3. Risk of Erroneous Deprivation of Parent-Child Relationship*

"The parent's, child's, and government's interest in a just and accurate decision dovetails with the third *Eldridge* factor—that of the risk of erroneous deprivation" of the parent-child relationship as a result of the procedure that was followed. *M.S.*, 115 S.W.3d at 549; *see also R.M.T.*, 352 S.W.3d at 22. The Department posits that the risk of erroneous decision with regard to the termination of Father's parental rights was not significant because "[he] was ably represented at trial by counsel." The Department asserts that Father, through his counsel, "had the opportunity to present evidence and cross examine witnesses." The Department further asserts that the trial court "placed no restrictions that prevented [Father's] access to courts."

While Father was represented at trial, his counsel made clear that she had been appointed to replace Father's first-appointed counsel. She informed the trial court that she had never spoken to Father. She was unaware of Father's position on the claims made by the Department or what evidence he had to offer relevant to the parent-child relationship. Appointed counsel told the trial court that she did not have a witness list because she had not been able to communicate with Father.

At trial, the Department presented nine witnesses. These witnesses included Mother and the Department caseworker, who each provided damaging testimony

against Father.[6]  The Supreme Court of Texas has stated that "[t]he right to cross examination is a vital element in a fair adjudication of disputed facts[,]" and it includes "the right to cross examine adverse witnesses and to examine and rebut all evidence[.]"  *Richardson v. City of Pasadena*, 513 S.W.2d 1, 4 (Tex. 1974). Because he did not participate during trial, Father's counsel was unable to communicate with him regarding strategy for cross-examining the Department's witness or regarding the presentation of evidence to rebut the witnesses' testimony. *See In re D.C.C.*, 359 S.W.3d 714, 718 (Tex. App.—San Antonio 2011, pet. denied) (Simmons, J., concurring) ("Had she been present at the trial, the mother would have heard the State's evidence and could have responded with evidence that her attorney simply could not provide.").

We also note that, despite his representation by counsel at trial, Father was effectively without appellate counsel during the 30-day period—following the signing of the termination orders—in which he was permitted to file a motion for new trial.  *See* TEX. R. APP. P. 329b(a); *see also In re P.M.*, No. 15–0171, 2016

---

[6]     Mother testified that she and Father had both been involved in the manufacturing of meth in Pennsylvania and in Galveston.  She stated that each had been on probation in Pennsylvania for DWI when they left that state, eventually traveling to Texas.  Mother testified that they each violated their respective probation when they left Pennsylvania.  She also testified that Father was physically abusive to her one time when she was pregnant with D.W.  The caseworker testified that Father did not comply with all of the terms of the court-ordered family service plan.  She stated (1) he had not visited D.W.; (2) he had not kept her informed of his address changes; (3) he had not provided her with proof of his employment; and (4) he had not completed the required drug tests.

WL 1274748, at *3 (Tex. April 1, 2016) (holding that, in government-initiated parental rights termination proceedings, the statutory right of indigent parents to counsel endures until all appeals are exhausted). The trial court signed the judgment terminating Father's parental rights on December 7, 2015. The next day, his counsel filed his notice of appeal, and the trial court signed an order permitting Father's counsel to withdraw from representing him. Appellate counsel was not appointed by the trial court until December 30, 2015. In a motion for extension of time to file Father's appellate brief, Appellate counsel informed this Court that she did not receive notice, informing her that she had been appointed to represent Father, until January 6, 2016, one day before the 30-deadline to file a motion for new trial. Thus, Father was afforded little opportunity to file a motion for new trial in which he could have explained what evidence he would have offered to defend against the Department's evidence if he had been permitted to participate in trial by teleconference.

On appeal, the Department also assails Father's due-process complaint by asserting that Father had an opportunity to testify at trial. The Department points to its request during trial to call Father as a witness. It claims that Father's counsel objected to his being called as a witness for strategic reasons. The Department asserts that, although it withdrew its request for Father to testify, Father's counsel could have called him to testify by video.

The record, however, does not indicate that Father's counsel objected to his testifying for strategic reasons. Instead, counsel objected to Father's being called as a witness because counsel had not had an opportunity to speak with him before trial. More importantly, Father's attorney objected to his testifying because Father did not have the opportunity to be present for the four-day trial and to hear the testimony of the nine witnesses presented by the Department. Had Father testified, he would have been subjected to cross-examination without having had the benefit of hearing the other evidence presented, including the damaging testimony of Mother and the Department's caseworker. In addition, Mother's attorney stated that she objected to Father's testifying by video feed because that would mean that Mother would not be able to hear Father's testimony.

The Department also asserts that Father "waived" his due-process complaint because his attorney waited until the first day of trial to request a continuance and to request facilitation of Father's appearance. Although the timing of a motion may factor into whether a trial court properly exercises its discretion in granting or denying it, there is no stated procedural deadline for filing a motion to appear at trial by alternate means or for filing a motion for continuance. *See* TEX. R. CIV. P. 251, 252.

We note that the record reflects that Father's attorney learned of his extradition on November 16, 2015. At the pretrial conference, counsel told the

trial court that, even when she learned of Father's extradition, she was not informed of his whereabouts. She explained,

> I had no other contact information at that point. I got some information from the attorney from the mom. I did some research on the Internet. I located a phone number for the prison facility. I verified through their answering system that, yes, he was there. It is a really strange phone system they've got. I have been on the phone for about an hour and a half trying to get to a human being at the phone number for this prison. I cannot get a human being's voice.

Mother's attorney confirmed that she too had experienced difficulty in navigating the jail phone system until she discovered a "trick" to reach a live person at the correctional facility. Given the circumstances, Father's due-process complaint was not waived.

The Department further assails Father's due-process claim on the basis that his attorney did not offer evidence to show that Father's participation in the proceedings by telephone was possible. At the pretrial conference, held the morning of the first day of trial, Father's attorney told the trial court that she did not care if Father was able to see what was happening at trial, but she did want him to be able to hear what was happening during trial. She suggested to the trial court that the person at the Pennsylvania correctional facility who was facilitating Mother's appearance could be contacted to determine if that person could assist in arranging for Father to participate by telephone for the start of trial that afternoon. The trial court rejected that request, stating, "So, once again, it's the same thing.

I'm not going to let them just hear and participate that way." Thus, the record shows that the trial court did not deny counsel's request for Father to participate by telephone based on a lack of evidence that such arrangement was not feasible. Rather, the trial court was not amenable to Father's participation by telephone. While the trial court ruled that Father could participate at trial by video conference, like Mother, the record shows that the IT technician correctly informed the trial court, at the time the court made the ruling, that there might be limitations on the ability to have Father appear by videoconferencing along with Mother. Indeed, the record shows that it was not technically possible for both to appear simultaneously by video.

In its brief, the Department also asserts that Father was not entitled to a continuance because he had not kept his counsel informed of his whereabouts before he was extradited to Pennsylvania. The Department correctly points out that it is a party's duty to make himself available and to keep his counsel notified of his whereabouts. *See In re D.W.*, 353 S.W.3d 188, 193 (Tex. App.—Texarkana 2011, pet. denied) (concluding no abuse of discretion in denying motion for continuance when mother had not been in contact with her attorney and her whereabouts could not be determined at the time of trial). The Department bases its presumption that Father had not kept his counsel informed of his whereabouts on counsel's statement, in her verified motion for continuance, that she had been

29

unable to make contact with Father. At the pretrial conference, counsel informed that trial court that she had replaced Father's first appointed counsel, and "I have never had contact with [Father]." Father's counsel did not indicate that she had not received Father's contact information or that it was Father's fault that she had not contacted him.

Interestingly, the record shows that, during the first year the case was pending, Father appeared at numerous hearings and court-ordered mediations with his first-appointed counsel. The last hearing that Father attended with his first-appointed counsel was a permanency hearing on April 2, 2015. He also attended a court-ordered pre-trial mediation on April 10, 2015. Trial was originally set for May 18, 2015, but the trial court granted Mother's request for a six-month continuance, re-setting trial to November 30, 2015. The trial court coordinator made a notation in the case summary record on June 26, 2015, indicating that Father's first-appointed counsel, who had been appointed in June 2014, was "removed from the case" and that new counsel was appointed to represent Father. After that time, Father made no more appearances in the trial with his newly-appointed counsel.

We note that, in his brief, Father correctly asserts that "there is nothing in the record to show that [Father] was notified of this change in counsel." To the extent that Father could have addressed whether he had been informed of the

change in counsel in a motion for new trial, he was effectively denied that right because he was without appellate counsel for 29 days of the 30-day period to file a motion for new trial.[7]

After considering the circumstances of this case, and the procedure that was used, we conclude that, under the third *Eldridge* factor, there was a significant risk of erroneous deprivation of the parent-child relationship between Father and D.W. Under the unique circumstances of this case, the trial court should have considered Father's participation by telephone and given his counsel time to facilitate his participation. Balancing the three *Eldridge* factors, we hold that Father was denied procedural due process. In short, he was denied a meaningful opportunity to participate in the proceedings.

We now turn to whether the denial of procedural due process to Father was harmful error. To obtain reversal of a judgment based on trial court error, an appellant must show that the error probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to

---

[7] An attorney may withdraw from representation of a client only if the attorney satisfies the requirements of Rule 10 of the Rules of Civil Procedure. *O'Kane v. Chuoke*, No. 01–05–00523–CV, 2007 WL 926494, at *2 (Tex. App.—Houston [1st Dist.] Mar. 29, 2007, no pet.) (mem .op.). If no counsel is substituting for the withdrawing attorney, counsel's motion to withdraw must state "that a copy of the motion has been delivered to the party; that the party has been notified in writing of his right to object to the motion; whether the party consents to the motion; the party's last known address and all pending settings and deadlines." TEX. R. CIV. P. 10. Father correctly points out that his trial counsel's motion to withdraw, filed the day after the judgment was signed, satisfied none of these requirements.

the appellate court. TEX. R. APP. P. 44.1(a). Here, when it effectively denied

Father any method of meaningful participation at trial, the trial court foreclosed the

presentation of evidence by Father to counter that offered by the Department.

Moreover, Father was unable to show what that evidence may have been because

he was effectively denied counsel during the time period in which he could file a

motion for new trial. Thus, we hold that the denial of procedural due process in

this case "probably prevented [Father] from properly presenting the case" on

appeal. *See* TEX. R. APP. P. 44.1(a)(2); *see also T.L.B.*, 2008 WL 5245905, at *5

(holding, in termination-of-parental-rights case, that trial court's denial father's

meaningful participation in trial violated his due-process rights and probably

prevented him from properly presenting case on appeal).

We sustain Father's first issue.[8]

## Mother's Appeal

## A.     Denial of Request for Bench Warrant

In her first issue, Mother complains that the trial court abused its discretion

when it denied her request for a bench warrant and instead granted her alternate

request to appear at trial by video conferencing. Mother asserts that her

appearance at trial by video from the Pennsylvania correctional facility was

prejudicial to her because her image was projected on a large screen in front of the

---

[8]     Father's first issue is dispositive of his appeal. Accordingly, we do not address his
        remaining issues. *See* TEX. R. APP. P. 47.1.

jury, while she was in shackles and wearing her prison uniform. Mother also asserts that she could not adequately participate in the trial by video. She points out that there were instances (1) when it was difficult for her to confer with her attorney, (2) when she could not hear the proceedings, or (3) she could not be heard in the courtroom.

### 1. *Applicable Legal Principles*

We review a trial court's decision on an inmate's request for a bench warrant for an abuse of discretion. *See In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003). The test for abuse of discretion is whether the trial court's ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000).

The right to appear in a civil proceeding is not absolute, and an inmate's right to personally appear must be weighed against the integrity of the correctional system. *Z.L.T.*, 124 S.W.3d at 165. Several factors are relevant in the determination of whether to grant an inmate's request for a bench warrant: (1) the cost and inconvenience of bringing the inmate to the court proceeding; (2) the security risk to the court and the public; (3) whether the inmate's claims are substantial; (4) whether the court hearing can reasonably be delayed until the inmate's release; (5) whether the inmate can produce admissible, noncumulative testimony that cannot be effectively presented by deposition, telephone, or other

means; (6) whether the hearing is before a judge or a jury; and (7) the inmate's probability of success on the merits. *Id.* at 165–66.

A trial court does not have an independent duty to assess these factors; instead, in accordance with generally applicable rules of procedure, litigants bear the burden "to identify with sufficient specificity the grounds for a ruling they seek," and "a litigant's status as an inmate does not alter that burden." *Id.* at 166 (citing TEX. R. CIV. P. 21; TEX. R. APP. P. 33.1(a)(1)(A)). The inmate has the sole burden to justify the necessity of her presence by producing factual information showing these factors. *See id.*

### 2. *Analysis*

In her motion for bench warrant, Mother requested to be present at trial to allow her "[to] fully participate in the proceedings." She averred that she had information regarding "her activities in Pennsylvania that are relevant to the retention of her parental rights and her attorney's ability to demonstrate the best interest of the child." Mother claimed that "her presence at trial was necessary to bring forth evidence of her future stability and her ability to provide emotionally, physically, and financially for her child." She further asserted that "her presence is necessary to assure due process in the proceeding." Mother requested, in the alternative to a bench warrant, that the trial court permit her to appear at trial via

video conferencing. The trial court denied Mother's request for a bench warrant but permitted her to testify by video conferencing.

When she testified at trial by video conferencing, Mother addressed "her activities in Pennsylvania" that were "relevant to the retention of her parental rights" and "the best interest of the child." She also had the opportunity to address in her testimony "her future stability and her ability to provide emotionally, physically, and financially for her child." In other words, Mother's testimony by video conferencing covered the topics she had identified in her motion as supporting her need for a bench warrant. Additionally, Mother failed to provide factual information establishing why her interest in obtaining a bench warrant outweighed the impact on the correctional system. *See id.* at 165. For these reasons, we conclude that the trial court did not abuse its discretion in denying Mother's request for a bench warrant. *See id.* at 165–66.

Mother now claims on appeal that the trial court abused its discretion in denying her request for a bench warrant because, appearing on a large projection screen in shackles and prison uniform, was prejudicial to her.[9] A party preserves error by a timely request that makes clear the grounds for the request and by

---

[9] Nothing in the record indicates that Mother was in shackles. The record does indicate that Mother was wearing a striped jail uniform. We note that Mother's attorney did question the venire regarding whether Mother's incarceration would affect their views. In doing so, the attorney mentioned Mother's jail uniform. By questioning the venire about the issue of incarceration, any risk of prejudice to Mother based on her incarceration was reduced.

obtaining a ruling on that request, whether express or implicit. TEX. R. APP. P. 33.1(a). Mother did not raise the concerns regarding her appearance in the trial court in her motion for a bench warrant or at any time during trial. Thus, Mother's complaints on appeal have not been preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1)(A)); *see also In re D.A.H*, Nos. 13–07–444–CV, 13–07–450–CV, 2008 WL 3920772, at *4 (Tex. App.—Corpus Christi Aug. 27, 2008, no pet.) (mem. op.) ("[A] defendant must make a timely objection against being tried in prison clothes or such rights are waived.").

Mother also complains on appeal that she could not always hear what was being said during trial and that her testimony was not always heard in the courtroom. The record shows that, when Mother did not hear a question asked of her, it would be repeated. Similarly, if her response to a question was not heard, she also repeated it.[10]

Mother also asserts that she was not permitted to adequately confer with her attorney during trial. The record, however, reflects that accommodations were made for Mother to confer with her attorney. The trial court granted the request of

---

[10]     We note that the Department offered into evidence a video of Mother speaking to a Galveston Police Officer when she was arrested on June 7, 2014. Mother stated during trial that she had not been able to hear the video's audio very well when it was played for the jury. However, Mother's attorney was present when the video was played. And Mother's attorney made no objection to the Department's questioning of Mother regarding the content of the video.

Mother's attorney to be permitted to confer with Mother before she cross-examined the Department's witnesses.

In any event, as with her other complaints related to the denial of the bench warrant, Mother did not object to the proceedings on the grounds that (1) she could not hear the proceedings; (2) she could not be heard; or (3) she could not adequately confer with her counsel. Accordingly, these complaints are not preserved. *See* TEX. R. APP. P. 33.1(a)(1)(A)).

We overrule Mother's first issue.

## B. Voir Dire

In her second issue, Mother asserts that the trial court abused its discretion "when it disallowed [Mother's] trial argument and presentation as to conservatorship issues." Specifically, Mother's complaint pertains to the following portion of voir dire:

> [Mother's counsel]: Of those people who I just called out and who raised their placards, of those people how many of them were involved in what I would call modification hearings, which is—if you've been in one, you would know it? Okay. So in family cases, you can come back as a parent; and if one parent has conservatorship, the other parent can petition the Court because circumstances or residence or whatever the case may be.
>
> [The Department's counsel]: Judge, may we approach?
>
> THE COURT: Yes.
>
> (Out of hearing of the jury.)

37

[The Department's counsel]:  Judge, I'd object at this point.  There are no pleadings for conservatorship or for any other questions to go to the jury, other than termination at this point.[11]

[Mother's counsel]:  And, Your Honor, I believe it absolutely goes to whether or not they terminate as to what other possibilities would—would be available.  I'm quite certain one of the first questions that will be asked [by the jury] if it is not addressed is, "If we say no to termination, what happens?"  I have an absolute right to know the legal sequence of that.  I'm not talking about this case specifically, but what the legal consequences are of termination and managing conservatorship.

[Father's counsel]:  And I would interject if I could, it goes to the best interest.  Also under the termination, it's one of many factors as to what best interest and the future of the child is.  It's one of the things to consider—are what are your future plans and what could happen to this child.

THE COURT:  But I think that clouds things up.  So, no, don't go there.

[Mother's counsel]:  And, Your Honor, I would just say I understand your ruling and I understand it clouds things up; but I also think my client has a right for the jury to know what the legal consequence is.

In her brief, Mother asserts, "The Court completely shut down [Mother's] trial counsel's attempt to pursue, explore, and present conservatorship issues with the jury[.]"  She claims, "In limiting trial counsel's ability to address issues specifically pled for by [the Department], and in cutting off her ability to properly

---

[11]    The Department acknowledges in its brief that it had pled conservatorship as an alternate remedy to termination in its petition.  However, the Department correctly points out that the issue of conservatorship was not litigated, argued, or submitted to the jury at trial.

argue certain matters pertaining to the best interests of the child, the [trial court] abused its discretion."

Voir dire examination protects the right to an impartial jury by exposing possible improper juror biases that form the basis for statutory disqualification. *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 749 (Tex. 2006); *see* TEX. GOV'T CODE ANN. § 62.105(4) (Vernon 2013) (disqualifying from jury service anyone who "has a bias or prejudice in favor of or against a party in the case"). The primary purpose of voir dire is to question potential jurors about specific views that may prevent or substantially impair them from properly performing jury duty. *Vasquez*, 189 S.W.3d at 749. In civil cases in Texas, the trial court has broad discretion in conducting voir dire. *See id.* at 753. Counsel's latitude to question the venire panel, while broad, is subject to reasonable restraints by the trial court. *Id.* at 750.

We determine whether a trial court erred in placing restrictions on counsel's voir dire under an abuse-of-discretion standard. *See Babcock v. Nw. Mem'l Hosp.*, 767 S.W.2d 705, 707 (Tex. 1989). For an appellate court to determine whether a trial court abused its discretion by restricting voir dire, the complaining party must "'adequately apprise[ ] the trial court of the nature of the inquiry'" she wished to make of the venire panel. *Vasquez*, 189 S.W.3d at 758 (quoting *Babcock*, 767 S.W.2d at 707); *see also Odom v. Clark*, 215 S.W.3d 571, 574 (Tex. App.—Tyler

2007, pet. denied). Generally, "[when] counsel merely states a subject area in which he wishes to propound questions, 'but fails to present the trial court with the specific questions he wishes to ask, the trial court is denied an opportunity to make a meaningful ruling and error is not preserved.'" *In re Commitment of Polk*, No. 09–10–00127–CV, 2011 WL 662928, at *3 (Tex. App.—Beaumont Feb. 24, 2011, pet. denied) (mem. op.) (quoting *Odom*, 215 S.W.3d at 574). Nonetheless, "[t]here is no requirement to place specific questions in the record if the nature of the questions is apparent from the context." *Babcock*, 767 S.W.2d at 708 (concluding that language in motions in limine together with recorded voir dire of excused juror on the subject matter at issue made it "obvious" what questions Babcocks wanted to ask venire panel).

Here, Mother did not make a record of the questions she would have asked the jury about the general topic of conservatorship. Nor are those questions otherwise obvious from the context of the record. Because her potential questions regarding conservatorship were neither presented to the trial court nor otherwise apparent from the record, Mother has not preserved this issue for our review. *See Polk*, 2011 WL 662928, at *3 (holding that Polk had not preserved complaint that trial court abused its discretion when it forbade Polk from discussing with the venire panel topic of civil commitment because record did not reflect what questions Polk would have asked venire panel regarding that topic); *Odom*, 215

S.W.3d at 574–75 ("[T]he trial court was merely informed of ten broad areas of inquiry. Because the Odoms' potential questions were neither before the trial court nor apparent from the context in which their areas of inquiry were stated, the Odoms have failed to preserve their issue for review.").

We overrule Mother's second issue.

**C.    Closing Argument**

In her third issue, Mother asserts that she was denied a fair trial because, during closing arguments, the Department was "permitted to make improper jury argument and to ask the jury to be specifically guided and influenced by facts not in evidence." Mother points to two instances during closing argument in which Mother's counsel objected to the Department's remarks. The trial court sustained both objections; however, Mother did not request the trial court to instruct the jury to disregard the comments.

"Appellate complaints of improper jury argument must ordinarily be preserved by timely objection and request for an instruction that the jury disregard the improper remark." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). A complaint of incurable argument may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial. *Id.* (citing TEX. R. CIV. P. 324(b)(5)). Here, Mother did not request the trial court to instruct the jury to disregard the remarks after her objections were sustained. Nor did she file a

motion for new trial, asserting that the argument was incurable. Accordingly, Mother's complaint regarding the Department's jury argument is not preserved for our review. *See id.*; *see also Estate of Muniz v. Ford Motor Co.*, No. 04–12–00263–CV, 2013 WL 2645284, at *13 (Tex. App.—San Antonio June 12, 2013, no pet.) (mem. op.) (holding that complaint about remark made by opponent during closing argument waived when party did not seek an instruction to disregard after trial court sustained objection to remark).

We overrule Mother's third issue.

## Conclusion

We reverse the trial court's judgment with respect to the termination of the parent-child relationship between Father and D.W. and remand that issue to the trial court for further proceedings. We otherwise affirm the judgment.


Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.