**Opinion issued December 16, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-25-00457-CV

————————————

## IN THE INTEREST OF B.D.Z.P., JR. AKA B.M., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-00823J**

---

## MEMORANDUM OPINION

Appellants S.M. aka S.M., S.B.G. ("Mother") and J.B.G. aka J.B.B. ("Father") are the biological parents of B.D.Z.P., Jr. aka B.M. ("Ben"), their only child together.[1]  On appeal from the trial court's order terminating their parental

---

[1]   Both Mother and Father have other children with different partners.  To preserve the parties' privacy, we identify all parents by their initials and use pseudonyms for the child who is the subject of this termination appeal and his siblings.

rights as to Ben, Mother and Father contend (1) the evidence is legally and factually insufficient to find any predicate ground for termination or that termination is in Ben's best-interest, and (2) the Department of Family and Protective Services should not have been appointed as Ben's managing conservator. Additionally, Father, who was incarcerated during trial, contends he was denied due process of law when the trial court refused to grant a continuance of the first day of trial so that he could appear in person after a bench warrant was signed. We affirm.

## Background

Mother has three children with three fathers: Kamryn and Zachary, with whom Mother lived in Oregon, and Ben, with whom she lived in Texas. Though Kamryn and Zachary have been the subject of child welfare proceedings in Oregon, only Ben is the subject of this appeal. Ben is also the only child whom Mother and Father share. Father has seven other children with other women.

The Department received a request for public service regarding Ben after Mother disclosed his birth to her therapist. The Department responded and noted concerns that Mother was "mentally unstable," was on parole for criminal mistreatment of Zachary (and other offenses), did not have custody of Kamryn or Zachary, and was not permitted to care for any children without the permission of the Oregon Department of Human Services ("ODHS"). But the Department did not immediately remove Ben.

2

Removal proceedings started about two months later, when the Department received a referral alleging neglectful supervision. At the time, Mother was in Oregon and left Ben with a woman she knew from church. The removal affidavit states:

> [Mother] is currently incarcerated. [Mother] has cognitive delays and mental health concerns. [She] is on probation for ID theft and tampering with a witness in Oregon. [She] waterboarded her 2-year-old child [Zachary] when the child was 8 weeks old. [Mother] moved to Texas and was not supposed to have contact with any children including her own. [Mother] left [Ben] with [a church acquaintance] and went to Oregon for a parole visit. [The church acquaintance] was under the assumption that [Mother] would only be gone for one day. [Mother] has been informed that she has to stay in Oregon and can't have contact with [Ben]. [The church acquaintance] is not willing to be a foster parent or permanent placement for [Ben].

The removal affidavit also alleged that while Mother was in Oregon, she had allowed her father to have access to Ben even though he had sexually abused Mother from "childhood into adulthood." ODHS believed Mother posed a safety risk to her children. And the Department reached the same conclusion, stating in the removal affidavit that Mother posed a "significant danger to children" because she had engaged in "assault and deadly behaviors" against adults and children in the past.

The trial court appointed the Department as Ben's temporary managing conservator. At the time of removal and throughout the termination proceedings that followed, Father was incarcerated.

3

The trial court approved family-services plans for Mother and Father. Among other things, Mother's plan required her to establish and maintain safe housing, prove income, complete a parenting program, participate in substance abuse screenings and assessments and follow all recommendations, and participate in and complete psychological and psychosocial evaluations and follow all recommendations. And among other things, Father had to refrain from engaging in criminal activities, maintain safe and stable housing, participate in parenting sessions through individual counseling, participate in and follow all recommendations from a psychosocial assessment upon his release, and participate in and follow all recommendations from a Battering Intervention and Prevention Program assessment upon his release. Both Mother and Father worked on their services, with Mother completing many of them in Oregon.

The Department ultimately proceeded on the petition to terminate Mother's and Father's parental rights. About three weeks before trial, Father requested a bench warrant so that he could appear in person. Because the bench warrant had not been signed a week before trial, Father filed a written motion for continuance. The trial court signed the warrant the same day, but when trial started six days later, Father was not delivered to court. His counsel objected to proceeding in his absence on due-process and other grounds and orally renewed the continuance motion. The trial court questioned whether the warrant had been signed in time to facilitate

4

Father's transfer from the facility where he was incarcerated in North Texas to Houston and then recessed for about twenty minutes to secure Father's attendance by telephone instead. Father's counsel renewed his objection, arguing that Father being available only by telephone hindered their ability to communicate and confront the Department's witnesses. The trial court denied the continuance motion and proceeded with the testimony over two days.

Although Father was not physically present on the first day of trial, he did appear for the second day of trial pursuant to a second bench warrant. Mother was present on the first day of trial but participated by telephone on the second day because she was jailed in the interim due to a probation violation.

### *Oregon caseworker, Alicia Davis*

Alicia Davis, a caseworker in Oregon, testified at trial that ODHS received a report in October 2021 that Mother had threatened to "stick [Zachary and Kamryn] outside in the cold," "stick [Zachary] in the freezer," and give Zachary and Kamryn up for adoption to provoke a response from Zachary's father, whom she was dating at the time. When the October 2021 referral came in, however, ODHS already had a file on Mother because of other referrals. Davis explained that there were as many as thirteen referrals regarding Kamryn between 2018 and 2022. ODHS was concerned that Mother had locked Kamryn in a closet that was covered in feces and

contained a mattress on the floor and a portable DVD player. Asked whether the closet could be considered a small bedroom, Davis answered "no."

Additional referrals were made regarding Zachary, including in utero referrals. Only one of them was deemed "founded." After an investigation, ODHS concluded Mother had physically abused Zachary when she put his head under running water when he was six-months old and threatened to harm Kamryn, who was present.

ODHS began civil proceedings regarding the children, and criminal charges were also pursued. Mother pleaded guilty to physically abusing Zachary in August 2023. Zachary eventually went to live with his father, K.N., so Mother's parental rights were not terminated because there was a safe parent. Mother's parental rights to Kamryn had also not been terminated, though the ODHS case was still pending.[2] Because of the violence she inflicted on Zachary, Mother is prohibited from caring for any children without ODHS's permission, which ODHS has not given.

Davis testified that Mother was also subject to a no-contact order with K.N. because of domestic violence between them. Davis described the domestic violence as involving a "significant" number of incidents. But Davis overheard in a conversation between Mother and her counsel on the first day of trial that Mother and K.N. had been romantically involved a few weeks before trial, violating the

---

[2] Kamryn was placed with a paternal relative in Houston.

terms of Mother's probation. Additionally, Davis testified that although Mother's probation could end soon, Davis had been informed by Mother's probation officer that Mother's probation may be extended because she had recently committed identity theft.

Davis further testified that substance abuse had not been an issue for Mother during the ODHS case. ODHS had asked Mother to complete a psychological evaluation and follow up with the recommendations from the evaluation, which included intensive outpatient group therapy and individual therapy. They also asked her to take parenting classes, for which Mother provided a certificate. Davis believed that Mother was engaged in individual therapy and a domestic-violence program but was unsure about the intensive outpatient group therapy. Still, Davis felt that Mother had tried to "get around services" throughout the ODHS case and had not acknowledged "the impact of the harm that was done to her children while they were in her care." Mother had also not shown recent employment.

While acknowledging that Father was not involved in any of the incidents related to Kamryn and Zachary, Davis expressed some concern about him. She explained that Father had called the ODHS hotline to say he was going to kill Mother and that he was with Mother and the child at the time, causing her to be concerned for Father's mental health. Davis also testified that Father has a "significant criminal record."

### Zachary's father, K.N.

K.N. testified about the October 2021 incident with Zachary. K.N. had been living with Mother and Zachary for about a week when Mother asked him to leave the home. K.N. described Mother as "having one of those episodes when her sugar is too low and she's just going off and, I guess, blacking out or whatever you might call it." He felt having a baby had been "a lot on [Mother]." She had not been waking up when Zachary was crying to have his diaper changed. He wanted Mother to get checked out.

Shortly after K.N. packed his belongings and left the house, Mother called and told him to "come get" Zachary because she did not want him. Mother threatened to put Zachary in the rain and leave him outside. She also called a family friend and threatened to put Zachary in the freezer. K.N. called the police and started to return home. As he was doing so, Mother called on video and could be seen holding Zachary, then an infant, by his onesie "up in the air" with his neck unsupported. K.N. described Mother running water from the showerhead "all over [Zachary's] face." According to K.N., Mother said that she did not care if Zachary died. The record contains photographs K.N. had taken with his phone during a videocall with Mother which show Mother holding Zachary by his onesie with shower water pouring over his face.

8

K.N. also described an incident in which Mother chased him with a knife as he was preparing to leave the house. He squeezed by her, ran out of the house and into the street, and a witness called the police. According to K.N., Mother "blacked out, fake fainted, and just fell on the ground." She also threw and broke glasses. K.N. explained that although Mother received therapy for poor mental health, she did not always take the medication she was prescribed.

K.N. claimed that Mother made several false accusations of domestic violence against him, leading to him going to jail twice. But she later recanted those allegations, and he was never convicted on any charges. K.N. denied that he had seen Mother romantically before trial. He did not believe it would be safe to send Zachary to live with Mother based on "incidents in Houston," Mother "constantly going to jail," and "constantly being in domestic violence relationships." K.N. denied seeing Mother before trial.

### *Kamryn's father, K.P.*

Kamryn's biological father, K.P., also testified. At the time, he was incarcerated on a charge of human trafficking. He testified that he and Mother only knew each other for a few months before Kamryn was born, and Mother had moved back to Oregon during her pregnancy. After Kamryn's birth, he and Mother kept in touch mostly through social media unless Mother visited Houston, where he lived. Like K.N., K.P. did not believe that Mother was a safe parent. Although Mother had

9

not committed any violence against him and he was not personally aware of any violence she had committed against others, K.P. testified that Kamryn had "blurt[ed] out" that Mother pushed him, kicked him, or hit him in the face. Mother had also made threats regarding Kamryn—specifically, she threatened to leave Kamryn "in the house in the cold to die"—after she and K.P. had a fight about money.

### *Mother*

The record contains Mother's psychological evaluation, taken in early 2023. Mother reported that she experienced various forms of abuse throughout her life, including sexual abuse by her father. As an adult, she was involved in several relationships that involved physical or emotional abuse, including with K.N. She stated that K.N. was physically abusive, though she admitted the physical assaults were sometimes mutual. The evaluation recorded that Mother's baseline presentation was angry, severely anxious, and emotionally dysregulated. A clinician who provided Mother's psychotherapy sessions noted that Mother had an aptitude to hide her mental-health symptoms from people she encountered.

At trial, Mother confirmed her incarceration in Oregon. She was sentenced to fifteen months, with the possibility of parole, because her contact with K.N. violated the terms of her probation. Mother denied the contact and claimed that Davis had given the Oregon court false information. Mother acknowledged that because of her incarceration she could not care for Ben or work while incarcerated. But she stated

that she had the opportunity to obtain housing upon her release through the Portland Urban League. In Oregon, she had also completed parenting classes and individual therapy, done some volunteer work, attended a support group for women with postpartum depression, and participated in outpatient treatment.

Mother acknowledged that she was involved with child protective services because of what happened with Zachary. But she denied that the abuse occurred and that she pleaded guilty. Specifically, she denied that she ran water over Zachary's face, claiming that she was suffering from postpartum depression and had only yelled and threatened to give him up for adoption.

Mother testified that she had placed Ben with someone from church who was known to Ben and safe when she went back to Oregon for probation matters. When Ben was removed from the church acquaintance's home, there were no signs of abuse or neglect. Mother claimed the Department had completed a home study on the church acquaintance but not approved her for an unknown reason. She desired for Ben to be placed with the church acquaintance, a family member, or Father.

She met Father in Oregon. She lived with Father for about a year, observed him as a parent, and found him to be a responsible and loving father. During the year she lived with him, Father cooked, cleaned, and worked. She had complications in her pregnancy with Ben, and Father helped her out. When she moved to Houston, Father moved with her for a short time.

11

Mother acknowledged a history of domestic violence involving Father. She estimated there were three occasions of domestic violence between her and Father. The first instance was around 2021, and the other instances were in 2023 when she was pregnant and "having mood swings."[3] She served as the primary witness in prosecuting Father for domestic violence in 2023. She claimed this incident of domestic violence was her fault, as she struggled to control her anger, began throwing and breaking things, and when Father tried to restrain her, she was hurt. Mother admitted that she had cut Father with a wine glass.

Mother's criminal history included other assaultive conduct. In 2012, Mother was charged with murder by stabbing the victim with a knife. She was adjudged guilty of aggravated assault with a deadly weapon for this offense and sentenced to two years in prison, for which she received 782 days of jail credit. Then, in 2019, police in Oregon responded to a disturbance between K.N. and Mother. K.N. had torn clothing, scratches to his neck and chest, and a tiny puncture wound to his left buttocks and hip area. Kamryn was inside the home. Officers interviewed K.N., who explained that during an argument, Mother struck him with a lamp, shattering its glass. Mother then threatened to stab him with a knife, scratched his chest, and poked him in the buttocks with the knife. Mother told the police that K.N. had been

---

[3] Mother initially testified that the third incident of domestic violence happened in 2024 on a date after Ben was born. Asked about that at trial, she clarified the third incident also happened in 2023 when she was pregnant with Ben.

arrested a few days earlier for cutting her on the arm but later admitted that she cut her arm herself.

*Father*

The Department presented evidence through Father's testimony that there was also violence in his relationship with Mother. Father confirmed that he was charged with assaulting Mother and then violated a bond condition when he twice contacted her despite being prohibited from doing so. After Father was convicted and sentenced to two years for the bond violation, the State moved to dismiss the underlying charge of "assault – family violence – 2nd offender."[4] Father denied that he had actually assaulted Mother.

Beyond this offense, the Department presented evidence of other criminal charges. Father also testified that he had been convicted five times before, with the most recent conviction being the violated bond order. Father had previously been charged in Houston for failure to identify himself. Before that, he was convicted for stalking the mother of some of his other children in Oregon in 2021. Father testified that his other convictions included unlawful use of drug paraphernalia in 2015 or 2016. And before that, tampering with a motor vehicle, DUI, and leaving the scene of an accident in Missouri when he was seventeen years old.

---

[4] The criminal complaint on the "assault – family violence – 2nd offender" charge alleged that Father was convicted previously of domestic assault on a family member in Missouri in 2010

Father asked for an opportunity to parent Ben. Though he had never met Ben, Father has experience parenting other children. He explained that his eight children live in four states. At the time of trial, four children lived in Oregon, two children lived in Nevada, one child lived in Missouri, and Ben lived in Texas. Child services became involved with his oldest child, but he was deemed a safe parent and awarded custody of that child. Father had been ordered to pay child support for two children but fell behind on the payments because of his incarceration. Still, he tried to stay in touch with his children while he was in jail. Father described conversations with his children focused on their interests, school, and future plans.

Father testified that, before his incarceration, he had been employed since the age of sixteen and most recently worked as a liaison for a car dealership in Houston and as a salesman for a mattress store in Oregon and earned $69,000 in 2023, and $49,000 in 2024. He explained that his plans after release depended on the results of the trial. If he is reunited with Ben, Father would stay in Houston, start a trucking dispatch business, and work part-time while living with support from his parents until stable.

Father testified that alternatively he desired for Ben to be placed with a paternal relative or Mother. He believed that Mother can provide a safe and stable home environment for Ben and worried only that she would be "too Christ like." He claimed not to recall telling the Department's investigator that Mother carried a gun

14

and multiple knives.  And he stated that Mother never assaulted him or threatened him or Ben and that he lied when he claimed otherwise.

Father was confronted with a letter he wrote to the trial court in April 2024, one month after Ben's removal.  Among other things, the letter stated:

> I am being held on a falsified charge that was concocted by [Mother] in order to shirk her own charges of abuse towards me.  There are plenty of police reports to back my claims.  Not only will I clear my name but upon my release I will be filing a restraining order against [Mother.]  At this point in time my concern is [Ben].  . . . During the pregnancy [Mother] threatened my sons life, there is a 911 call where I called to have HPD assist me and was being held against my will by [Mother] where she was recorded saying she would kill me and my son.  I took this threat serious every time it was uttered because she has killed her ex before.  She got out of doing time by claiming to be a sex trafficking victim which she has admitted to me she never was.  She does practice sex work but its by her own free will.  Her threats lead me to believe she will harm my son given the right motive and me as well.  . . .  She has cut me multiple times and persuaded me that my son's life was in danger in order to get me to bond her out.

Asked about the veracity of the letter, Father claimed it contained false statements, somebody else had written it, and he had merely signed it.  He claimed that he made statements against Mother under coercion when the Department told him that his side of the family could gain custody of Ben if he did so.  He claimed that he had also given false statements about Mother's violent behavior under oath in earlier hearings.  On cross-examination from the Department, Father denied that he and Mother had struck a bargain before trial to give favorable testimony to avoid termination.

### *Texas caseworker, Omesha Adams*

The Department's caseworker Omesha Adams testified that the Department's primary goal for Ben is unrelated adoption.

Adams testified that Mother has a history of violence and would be incapable of providing a safe and stable environment for Ben. Adams agreed that Mother had "done services" after the October 2021 incident in Oregon with Zachary, including being in therapy "for a long time." Because Mother had completed her services in Oregon, the Department did not have much information about the quality of the services or the service providers. But Adams testified that the services were equivalent to things ordered in Texas. Still, several things remained outstanding on Mother's family service plan, including proof of six months of stable income, proof that any apartment leased through the Portland Urban League was safe, and proof that she completed the intensive outpatient group therapy recommended. Adams opined that it would be dangerous to return Ben to Mother because Mother was mentally unstable, had an angry attitude, and felt like "everyone wrongs her."

Adams acknowledged that Father had "done what he could" on his family service plan while incarcerated; however, his incarceration, lack of housing, and unemployed status rendered him incapable of providing a safe and stable home for Ben.

Adams confirmed that Father wished for Ben to be placed with a relative, C.B.G. But the court had placed a no-move order on Ben, which required total agreement from the caseworkers for placement changes. A study of C.B.G.'s home had been conducted, but the caseworkers did not agree to move Ben. She explained that Ben is hitting all milestones in his foster placement. He is current on checkups and vaccinations in foster care. He does not have any special needs beyond occupational therapy.

### *Child advocate, Gina Holder*

When child advocate Gina Holder testified at trial she had not talked with Mother or Father but had visited Ben. She explained that Ben has been in the same foster home since removal, is doing well there, and has bonded with his foster mother. Ben is developmentally on target, and his physical and emotional needs are being met. Holder testified that Ben does not have any special needs, but when he was a baby, he balled his fist and struggled with grip. That issue had improved with occupational therapy.

Holder expressed no concerns for the care Ben was receiving in his foster placement, and she recommended termination with adoption. Holder explained that Ben's foster placement is an adoptive placement, and she believed it would be a good thing for Ben to be adopted there.

Holder was aware that C.B.G. had expressed a willingness to care for Ben and that C.B.G.'s home study was approved, but she did not believe that C.B.G. had been vetted by child advocates.

*Foster mother*

The foster mother testified that Ben had been living with her since he was removed in March 2024. Foster mother was bonded with Ben, loved him, and believed him to be happy. The household included foster mother, her partner, and her twelve-year-old granddaughter. Her granddaughter got along well with Ben, and they often played together. Ben also played with the children at his day care.

When asked about her plans for Ben, foster mother testified that she would put him in a school where he will learn Mandarin and Spanish, give him the best life possible, and love him. As for her and her partner's parenting abilities, she testified that she had cared for her two adult daughters and her granddaughter. Her partner had raised a child with special needs and still cared for that child. And foster mother had worked as a nanny for twenty-five years.

*Paternal relative, C.B.G.*

C.B.G. testified that she had known Father for a couple of years but did not have contact with him because Father became incarcerated soon after they met. When she learned of Ben and that he had been placed in foster care, she told her brother (Father's biological parent) that she was willing to adopt Ben and help in

18

any way she could, even if Father's parental rights were terminated. She is a stay-at-home wife, and her husband works outside the home. She testified that she knows how to care for Ben because she raised five children and helps with grandchildren. She further testified that she has the financial ability to meet Ben's needs without any contributions from the State. She stated that she understood the Department may have left Ben with the foster mother because he is happy there, but Ben should be with family. She acknowledged that she does not have a relationship with any of Father's other children, but she would try to facilitate one for Ben so long as it was safe.

### Trial court's decision

At the close of evidence, the trial court took the case under advisement and later issued an order terminating both Mother's and Father's parental rights to Ben. The trial court found that termination was appropriate under three predicate grounds because Mother and Father had:

- knowingly placed or knowingly allowed Ben to remain in conditions or surroundings which endangered Ben's physical or emotional well-being, *see* TEX. FAM. CODE § 161.001(b)(1)(D);

- engaged in conduct or knowingly placed Ben with persons who engaged in conduct which endangered Ben's physical or emotional well-being, *see id.* § 161.001(b)(1)(E); and

- constructively abandoned Ben, *see id.* § 161.001(b)(1)(N).

The trial court also found that termination of Mother's and Father's parental rights was in Ben's best interest and appointed the Department as Ben's sole managing conservator. *See id.* §§ 161.001(b)(2), .207(a). Both Mother and Father appealed.

**Motion for Continuance**

Father was incarcerated at the time of the trial on the Department's petition to terminate his parental rights. The trial court signed a bench warrant on March 7, 2025, ordering the sheriff to deliver Father for the trial scheduled to begin the next week. When trial began on March 13, however, Father was not present. The record does not make clear why Father was not delivered to trial, but the trial court commented on the record that the bench warrant may not have been signed in time to secure Father's transport to Houston from the North Texas facility where he was incarcerated. Father's counsel moved in writing before trial and again orally when trial began for a continuance to allow Father the opportunity to attend in person. The trial court denied the continuance but recessed the proceedings for a short time to secure Father's participation by telephone before proceeding with the first day of evidence. When trial recommenced for a second day in April, Father appeared in person pursuant to a second bench warrant. In his first issue, Father contends the trial court's denial of his continuance motion on the first day of trial denied him the opportunity to meaningfully participate in the proceedings that resulted in the

20

termination of his parental rights, thus violating his right to due process of law under the United States Constitution. *See* U.S. CONST. amend. XIV, § 1.

In analyzing a claim for denial of due process, we determine whether the complaining party has a liberty or property interest entitled to protection and, if so, what process is due. *In re D.W.*, 498 S.W.3d 100, 112 (Tex. App.—Houston [1st Dist.] 2016, no pet.). In a proceeding to terminate parental rights, a parent who is incarcerated has an interest that is entitled to protection. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 523 (1984)); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (parents have a fundamental liberty interest "in the care, custody, and management of their child"). "At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *In re D.W.*, 498 S.W.3d at 112. What process is due depends on the practical requirements of the circumstances. *Id.* We weigh three factors: (1) the private interest affected by the proceeding or official action; (2) the countervailing governmental interest supporting use of the challenged proceeding; and (3) the risk of an erroneous deprivation of the private interest due to the procedures used. *Id.* (referencing factors developed by the Supreme Court of the United States in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, the first factor—the private interests of parents and children in the accuracy and justice of the decision to permanently end their relationship—weighs

21

heavily in favor of providing Father an opportunity to participate in the proceedings and communicate with his attorney during trial. *Id.* at 113; *see also In re L.N.C.*, 573 S.W.3d 309, 322–23 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

For the second factor, the Department's countervailing interest is the protection of the child's best interest and is best served by "an accurate determination" as to whether Father "can and will provide a normal home." *In re D.W.*, 498 S.W.3d at 113 (quoting *In re M.S.*, 115 S.W.3d 534, 548–49 (Tex. 2003)). The Department "also has an interest in an accelerated timetable and a final decision that is not 'unduly prolonged' with negative psychological effects on [a child] left in limbo." *Id.* Expeditious proceedings in termination cases serve the child's strong interest in a final decision so that adoption to a stable home or return to the parents is not unduly prolonged. *Id.*

The record on whether granting Father's motion for continuance would have harmed Ben's or the Department's interests is mixed. Trial began on March 13, 2025, only a little more than two weeks before the statutory dismissal deadline. *See* TEX. FAM. CODE § 263.401(a) (requiring dismissal "unless the court has commenced the trial on the merits or granted an extension . . . on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator"). Father was not incarcerated locally in Houston, and instead was in a facility in North Texas, adding to the time

22

required for transport. The Department and the guardian ad litem were already recommending termination of Mother's and Father's parental rights and a permanent placement with an adoptive family, rather than reunification, for Ben. Ben's foster placement was an adoptive placement, and testimony at trial suggested a home study had been approved with Ben's paternal relative. On the other hand, Ben's placement at the time of the trial with his foster family was stable and satisfactory. And considering that Father was bench warranted but not brought to court, we find the Department's interest in beginning the case on March 13 cannot be given more weight than the interests of Father and Ben in a just and accurate result. *In re M.S.*, 115 S.W.3d at 548; *see also In re T.L.B.*, No. 07-07-0349-CV, 2008 WL 5245905, at *3 (Tex. App.—Amarillo Dec. 17, 2008, no pet.) (mem. op.) ("[C]oncerns for efficiency and economy are inferior to the private interest at stake as well as the risk of an erroneous termination decision."). Thus, the second factor also weighs in favor of finding that Father did not receive due process, though not heavily.

But the third factor does not. That is, the risk of erroneously depriving Father and Ben of their parent-child relationship was not so high as to conclude the trial court abused its discretion and deprived Father of due process considering Father, telephonically and through his counsel on the first day of trial and then in person on the second day of trial, had the opportunity to challenge the Department's evidence and participate in his own defense.

On this point, it is useful to compare the circumstances of this case with those in another decided by our sibling court in Houston. In *L.N.C.*, the Fourteenth Court held the trial court failed to give due process when it refused to continue a termination trial after a bench warranted parent was not delivered to court. *See* 573 S.W.3d at 322–24. The court concluded that the third factor evaluating the risk of an erroneous deprivation of parental rights weighed in favor of finding a due-process violation because the incarcerated parent's absence at trial meant that his counsel could not communicate with him about cross-examining witnesses or rebutting the Department's evidence. *Id.* at 323 (holding parent was denied opportunity to participate in the proceedings in violation of his right to procedural due process).

Distinguishable facts lead us to a different conclusion here. In *L.N.C.*, the termination trial was one-day long and the trial court refused to allow the father to participate by telephone, video, or other means. *Id.* at 319–20 (noting the right to cross-examination is "vital to a fair trial"). In contrast, here, the trial took place over two days, only the first of which Father was physically absent from and the second of which he attended in person. And unlike the parent in *L.N.C.*, Father was not entirely excluded from the proceeding on the day he was physically absent, as the trial court facilitated his participation by telephone. The telephonic participation was not without some difficulty. As Father points out in his brief, he could not see the witnesses or exhibits and there was trouble with the audio connection when the

24

attorney ad litem began cross-examining him, which resolved quickly. But the record also shows counsel vigorously cross-examining witnesses and objecting to evidence, as well as Father participating directly in challenging the Department's evidence. For instance, when the Department offered evidence of Father's criminal history, Father challenged the veracity of the Department's assertion about an exhibit. He also assisted with the admission of his own exhibits by explaining to the trial court how certificates for the classes he took in jail were awarded.

Additionally, much of the evidence presented on the first day of trial focused on the Department's allegations against Mother, with a caseworker from ODHS and Zachary's and Kamryn's fathers testifying. The Department's caseworker also testified about the allegations against Father, and Father was called adversely by the Department, but the first day of trial ended before counsel finished his direct examination of Father. On the second day of trial, counsel had the opportunity to meet with Father before concluding the examination, giving Father the opportunity to discuss any specific points he wished to make during the examination. Father's own witnesses were also presented during the second day of trial while he was present, giving him the opportunity to assist counsel in shaping his defense and addressing any issues from the first day of trial that Father believed should be

addressed. Under these unique circumstances, we conclude the third factor weighs against finding Father did not receive due process.[5]

Balancing all the factors, we hold that the denial of his motion for continuance did not deprive Father of a meaningful opportunity to participate in the termination proceedings and thus did not violate his right to procedural due process.

We overrule Father's first issue.

## Sufficiency of the Evidence

Both Mother and Father challenge the legal and factual sufficiency of the evidence supporting each of the trial court's predicate findings under Section 161.001(b)(1) of the Family Code—endangering conditions under Subsection (D), endangering conduct under Subsection (E), and constructive abandonment under Subsection (N)—as well as the finding that termination of their parental rights was in Ben's best interest under Section 161.001(b)(2). *See* TEX. FAM. CODE § 161.001(b)(1)–(2). We consider only the Subsection (E) and best-interest findings because they are dispositive as to both parents.

---

[5] Even had the trial court deprived Father of due process when it denied his motion for continuance, the error would not be reversible because the same unique facts preclude a conclusion that the error probably resulted in an improper judgment or probably prevented Father from presenting his case on appeal. *See L.N.C.*, 573 S.W.3d at 323–24 (requiring appellant to show due-process error arising from denial of motion for continuance was reversible); *see also* TEX. R. APP. P. 44.1

## A.    Standard of review and applicable law

A parent's rights to the "companionship, care, custody, and management" of their child are constitutional interests "far more precious than any property right." *Santosky*, 455 U.S. at 758–59 (quotation omitted); *see In re M.S.*, 115 S.W.3d at 547. A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges, duties, and powers as to the parent-child relationship, except for the child's right to inherit.  *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and construe the involuntary termination statutes in the parent's favor.  *Id.*  But parental rights "are not absolute" and "are accorded only to those fit to accept the accompanying responsibilities."  *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quotation omitted).  Recognizing that parents may forfeit their parental rights by their acts or omissions, we focus on protecting the child's best interest.  *See id.*

Because of the severity and permanency of the termination of parental rights, the evidence supporting termination must be clear and convincing.  TEX. FAM. CODE § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE § 101.007.  This is an intermediate standard that falls between "preponderance of the evidence," which is used in ordinary civil

proceedings, and "reasonable doubt," which is used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam).

Due to the elevated burden of proof in a termination suit, we do not apply the traditional formulations of legal and factual sufficiency on appeal. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). In a legal-sufficiency review in a termination case, we cannot ignore undisputed evidence contrary to a finding, but we must otherwise assume the factfinder resolved disputed facts in the finding's favor. *Id.* at 630–31. The evidence is legally insufficient if, viewing all the evidence in the light most favorable to a finding and considering undisputed contrary evidence, a reasonable factfinder could not form a firm belief or conviction that the finding is true. *Id.* at 631.

In a factual-sufficiency review, we must weigh disputed evidence contrary to a finding against all the evidence in the finding's favor. *Id.* The evidence is factually insufficient if, in view of the entire record, the disputed evidence a reasonable factfinder could not credit in the finding's favor is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id.*

In reviewing for evidentiary sufficiency, we must not usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Deciding whether and to what degree to credit the evidence is the factfinder's role, not ours. *In re J.O.A.*, 283

S.W.3d 336, 346 (Tex. 2009).  The factfinder is the sole arbiter of witness credibility. *Id.*

A single predicate ground under Section 161.001(b)(1) of the Family Code supports termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362.  If the factfinder finds multiple predicate grounds, we may affirm on any one ground. *See In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.).  But when termination is ordered under the predicate grounds in Subsection (D) or (E), we must review those grounds because they have special significance and can supply the predicate for future terminations.  *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (due process mandates appellate review of Subsection (D) and (E) findings when the issue is preserved, even if the termination could be affirmed on another ground); *see also* TEX. FAM. CODE § 161.001(b)(1)(M) (allowing termination if parent has had rights terminated with respect to another child under Subsection (D) or (E)).

**B.    The evidence was legally and factually sufficient to support termination of parental rights under Subsection (E) for endangering conduct**

We start with Mother's and Father's second issues challenging the termination of their parental rights under Subsection (E) for "engag[ing] in conduct or knowingly plac[ing] the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).  Under Subsection (E), endangerment encompasses "more than a threat of metaphysical

29

injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Instead, endanger means to expose the child to loss or injury or to jeopardize his emotional or physical well-being. *Id.*; *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The trial court must determine whether evidence shows that the endangerment of the child's emotional or physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). It is not necessary that the parent's conduct be directed at the child or that the child be injured. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The factfinder may infer specific danger to the child's well-being from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533.

However, termination under Subsection (E) must be based on more than a single act or omission. *In re E.G.A.*, Nos. 01-24-00204-CV, 01-24-00206-CV, 2024 WL 3941021, at *14 (Tex. App.—Houston [1st Dist.] Aug. 27, 2024, pet. denied) (mem. op.); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The evidence must show a voluntary, deliberate, and conscious course of conduct. *In re S.R.*, 452 S.W.3d at 360; *see also In re M.A.J.*, 612 S.W.3d 398, 407 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g).

30

Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of endangering conduct. *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Courts may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after he was removed from the parent's care. *Walker*, 312 S.W.3d at 617. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct."). "Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

### 1. As to Mother

Mother argues that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights to Ben under Subsection (E) because although evidence was presented at trial of her history with the criminal courts and child protective services in Oregon, that evidence was outweighed by

other evidence that Ben, himself, had not been abused or neglected, that she may have been suffering from post-partum depression when she held Zachary's face under shower water as an infant, and that she completed court-ordered services to address such past endangering conduct. We disagree.

Evidence that Ben was physically abused or neglected by Mother was not required under Subsection (E). The specific danger to the child's well-being may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffers no actual injury. *See Boyd*, 727 S.W.2d at 533. And certainly, evidence of how a parent has treated another child is relevant. *Jordan*, 325 S.W.3d at 724 (evidence parent had abused another child allows an inference that parent's violent behavior will continue in future); *see also In re P.N.T.*, 580 S.W.3d 331, 356 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (when reviewing an endangerment finding under Subsection (E), "the parent's treatment of other children must be considered"); *In re T.G.R.-M.*, 404 S.W.3d at 14–15 (considering mother's charge of felony offense of injury to sibling as evidence of endangering conduct).

Here, there was evidence Mother had mistreated both of her other children. More than one witness testified that Mother locked Kamryn in a closet, which the Oregon caseworker described as having "feces everywhere." According to Kamryn's father, Mother had threatened to leave Kamryn "in the house in the cold

32

to die," and Kamryn had "blurt[ed] out" that Mother pushed, kicked, or hit him. And Mother was enjoined from having any contact with children after pleading guilty in July 2023 to a felony count of criminal mistreatment for "intentionally and knowingly caus[ing] physical injury" to Zachary, an infant at the time, by running water over his head and threatening to put him in a freezer or leave him outside.[6] The record contains photographs showing Mother holding Zachary by his onesie with shower water pouring over his face. Zachary's father testified that Mother was angry with him when she abused Zachry.

Mother offered post-partum depression as an explanation for her abuse of Zachary. As factfinder, the trial court may not have found Mother's explanation credible, considering the other evidence of her inability to manage her anger, propensity for violence, and assaultive conduct. *See In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *13 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.) (noting that domestic violence, want of self-control, and a propensity for violence may also be considered as evidence of endangerment); *see also In re L.M.*, 572 S.W.3d 823, 834 n.4 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Evidence of criminal conduct, convictions, imprisonment, and their

---

[6]     The charging document from Oregon also included one count of tampering with a witness and several counts of identity theft.

33

effects on a parent's life and ability to parent, may establish an endangering course of conduct.").

Mother was charged with murder in 2012 for stabbing someone with a knife. She ultimately was not convicted of that offense but was adjudicated guilty for aggravated assault with a deadly weapon in 2023 in connection therewith and sentenced to two years in prison, for which she received 782 days of jail credit. And in 2019, police in Oregon responded to a disturbance between Mother and Zachary's father. The narrative in the police report describes a scene in which Mother was lying outside the house "in the street unresponsive with fluttering eyelids," and Zachary's father "had torn clothing[,] scratches to his neck and chest, and [a] tiny puncture wound to his left buttocks hip area." Officers went inside the house and found Kamryn in an upstairs bedroom, as well as "shattered lamp glass all over the floor and going up the stairs." At trial, Zachary described Mother throwing and breaking glass and chasing him with a knife, something Mother admitted.

Additionally, a criminal complaint admitted into evidence alleges that in October 2023, she caused Father bodily injury by cutting him with a knife. An emergency protective order was entered on Father's behalf, but Mother was arrested for violating it the next month. Father wrote to the trial court during the termination proceedings that Mother had cut him multiple times and threatened to kill him and Ben. Although Father recanted those allegations in his trial testimony, the trial court

could reasonably find the recantation was not credible because Father admitted that he had lied under oath. And Mother admitted herself that while she was pregnant with Ben, she got into fights with Father, had thrown and broken objects, and injured Father with a wine glass. *See In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *12 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (noting that courts have routinely considered evidence of parent-on-parent physical abuse in termination cases); *see also In re D.C.*, No. 01-11-00387-CV, 2012 WL 682289, at *9–10 (Tex. App.—Houston [1st Dist.] Mar. 1, 2012, pet. denied) (mem. op.) (parent's testimony other parent physically and mentally abused her supported termination of other parent's parental rights under Subsection (E)); *Jordan*, 325 S.W.3d at 724 (evidence of how parent treated other parent is relevant). In short, evidence that a parent has engaged in abusive or violent conduct in the past permits an inference that she will continue the violent behavior. *Id.*

In arguing that this evidence does not show she engaged in conduct that endangered Ben's physical or emotional well-being, Mother does not dispute that she has "made some mistakes." Instead, she argues the evidence that she is ready to move on from past endangering conduct is so significant that the trial court could not form a firm belief or conviction that she endangered Ben. In support, she emphasizes the evidence that she completed the court-ordered services intended to

35

address her past behaviors.[7] She reasons that if a parent's failure to engage in or complete services can be considered evidence of endangerment, particularly to the extent it suggests that past endangering conduct remains unaddressed, "the opposite must be true, *i.e.*, that a parent's successful completion of services can constitute evidence that the parent's past endangering conduct has been addressed and is unlikely to persist in the future."

Mother's completion of court-ordered services is commendable and some evidence the trial court could consider under Subsection (E), but it was not so overwhelming as to preclude a Subsection (E) finding. Mother's endangering conduct in the past included multiple acts that subjected her to the possibility of incarceration. *See In re V.V.*, 349 S.W.3d at 554 ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child."). And that conduct continued, as shown by her incarceration during the termination trial for violating the terms of her Oregon probation by having contact with Zachary and his father despite a court order prohibiting her from doing so. The contact occurred shortly before trial, when Mother knew her parental rights were at risk, yet she continued to engage in activity

---

[7] Mother also points to the evidence that the Oregon courts had not terminated her parental rights to Kamryn or Zachary. That evidence is not entitled to much weight, however, as the trial testimony established the Oregon case with respect to Kamryn was ongoing and the case with respect to Zachary had been dropped because Zachary had another safe parent.

that led to her being jailed in a different state.[8] She also continued to deny responsibility for her violent conduct toward Zachary at trial, even though court records admitted into evidence reflected her plea. This, combined with the evidence of physical abuse of other children and past criminal activity and domestic violence, established clear and convincing proof of a voluntary, deliberate, and conscious course of conduct that endangered Ben's physical or emotional well-being.

Viewing the evidence in the light most favorable to the trial court's judgment, we conclude the evidence is legally sufficient to support the trial court's finding of endangerment under Subsection (E). *See* TEX. FAM. CODE § 161.001(b)(1)(E). Further, considering entire record, we conclude the evidence to the contrary is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under Subsection (E). *See id.* We therefore overrule Mother's second issue challenging the trial court's predicate finding under Subsection (E).

Because the evidence was legally and factually sufficient to support the termination of Mother's parental rights under Subsection (E), we need not address the other predicate grounds for termination. *See In re A.V.*, 113 S.W.3d at 362; *see also* TEX. R. APP. P. 47.1.

---

[8] Additionally, the Oregon caseworker testified that Mother's probation was subject to being extended because of a recent charge of identity theft.

## 2.     As to Father

Father contends the Subsection (E) finding cannot stand as to him because it rests only on the evidence of his incarceration that left Ben in Mother's care, which he asserts is not enough.  While imprisonment, alone, will not support a finding of endangerment, evidence, including imprisonment, that demonstrates a course of conduct that has the effect of endangering the child's physical or emotional well-being will.  *See Boyd*, 727 S.W.2d at 534.  And here, Father ignores other evidence the trial court could reasonably consider under Subsection (E), such as the evidence that he physically abused Mother.  *See In re C.A.B.*, 289 S.W.3d 874, 886 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("If a parent abuses the other parent or children, that conduct can support a finding of endangerment even against a child who was not yet born at the time of the conduct.").

Although Mother testified at trial that she believed Father was a good parent and that her own behavior created the conflict between them, she testified that they engaged in three instances of domestic violence in the four years before trial.  Two of the three instances occurred when Mother was pregnant with Ben, and as Mother acknowledged, one instance led to a criminal complaint of "assault – family violence – 2nd offender" against Father.  The trial court admitted the criminal complaint, which described acts of physical violence against Mother by Father about eight or nine months before Ben was born.  The probable cause affiant, a detective with the

38

Houston Police Department's Major Assault & Family Violence Division, attested that he spoke with Mother about the incident, and she provided these details:

> [Mother] stated that on May 13, 2023, she and [Father] were in her apartment . . . . [S]he was laying on the bed and had received a text message from a male . . . and [Father] asked her who was texting her. . . . [S]he did not want to tell him and create tension between them, but [Father] snatched her cell phone from her hand and saw the text message, which made him angry. [Mother] stated that [Father] thew her cell phone on the floor then got on top of her and started punching her face repeatedly. . . . [Mother] stated that she had a busted upper lip, swollen left eye, and knots on her forehead from [Father] punching her and was internally bleeding in her mouth (teeth and gums). [Mother] stated that [Father] then picked up the standing fan and hit her on her back few times, which broke the fan. [Mother] stated that due to the assault, she felt pain and had visible injur[i]es on her face and bruises and abrasions on her back. [Mother] stated that [Father] was holding her down where she was unable to get out of her apartment, but as she got a chance, she ran out of the apartment and called 911.

Mother acknowledged at trial that the statements she made to the police were truthful. The State ultimately moved to dismiss the charge after Father was convicted of violating the terms of his bond issued in connection with the assault-family-violence charge by twice contacting Mother. Father was still incarcerated on this conviction at the time of trial.

Other evidence in the record supports an inference that the assault-family-violence charge was not singular and that Father has engaged in other violent or threatening acts against family members. For instance, Alicia Davis testified that Father called the ODHS hotline to say he was going to kill Mother. Additionally, the dismissed criminal complaint against him for assault family

39

violence includes a statement that Father was convicted of domestic assault on a family member in Missouri in 2010, and Father testified at trial that he has also been convicted of stalking the mother of some of his other children in Oregon in 2021.

Additionally, despite having previously accused Mother of committing domestic violence against him and threatening his and Ben's lives, Father stated that Mother would be a safe parent for Ben. Although Father recanted his allegations against Mother at trial, the trial court could disbelieve his recantation based on his admitted untruthfulness and instead consider as part of its endangerment analysis Father's willingness to subject Ben to further instability with Mother. *See In re S.L.L.*, No. 13-19-00442-CV, 2020 WL 103862, at \*6 (Tex. App.—Corpus Christi Jan. 9, 2020, no pet.) (mem. op.) (willingness to tolerate and excuse erratic behavior from a romantic partner at expense of a child's physical and emotional well-being can be considered in endangerment analysis). When considered collectively, evidence of Father's abuse toward Mother, failure to act on abuse by Mother toward him, and past and continued criminal activities, as well as his imprisonment supports a finding that Father engaged in a course of conduct that endangered Ben's emotional and physical well-being.

Viewing the evidence in the light most favorable to the trial court's judgment, we conclude the evidence is legally sufficient to support the finding of endangerment under Subsection (E). *See* TEX. FAM. CODE § 161.001(b)(1)(E). Further,

considering the entire record, we conclude the evidence to the contrary is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under Subsection (E). *See id.* We therefore overrule Father's second issue challenging the trial court's predicate finding under Subsection (E).

Because the evidence was legally and factually sufficient to support the termination of Father's parental rights under Subsection (E), we need not address the other predicate grounds for termination. *See In re A.V.*, 113 S.W.3d at 362; *see also* TEX. R. APP. P. 47.1.

## C.   The evidence is legally and factually sufficient to find that termination of Mother's and Father's parental rights is in the child's best interest.

We turn to Mother's fourth issue and Father's fifth issue challenging the trial court's finding that termination of their parental rights is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(2). Along with a predicate violation, a party seeking to terminate another's parental rights must show by clear and convincing evidence that termination is in child's best interest. *Id.* The best-interest inquiry is "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.]

41

2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

A factfinder may consider several factors to determine a child's best interest:

- the desires of the child;

- the present and future physical and emotional needs of the child;

- the present and future emotional and physical danger to the child;

- the parental abilities of the persons seeking custody;

- the programs available to assist those persons seeking custody in promoting the best interest of the child;

- the plans for the child by the individuals or agency seeking custody;

- the stability of the home or proposed placement;

- acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.* at 372; *In re D.R.A.*, 374 S.W.3d at 533. But the lack of evidence cannot be used as if it were clear-and-convincing evidence supporting a termination finding. *In re E.N.C.*, 384 S.W.3d at 808. In some cases, undisputed evidence of only one factor may be enough to support a finding that termination is in the child's best interest; in other cases, there could be "more complex facts in which paltry evidence relevant to each

42

consideration mentioned in *Holley* would not suffice" to support termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

In addition, the Family Code sets out factors for evaluating the parent's willingness and ability to provide the child with a safe environment, including:

- the child's age and physical and mental vulnerabilities;

- whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

- the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

- the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable time;

- whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and

- whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence when conducting the best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds can also be considered in support of a finding that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 28. A factfinder may infer that

43

past conduct endangering the child's well-being may recur if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.); *Jordan*, 325 S.W.3d at 724.

Mother and Father contend that no rational factfinder could have formed a strong conviction or belief that severing the parent-child relationship was in Ben's best interest. But several factors support the trial court's finding.

There is no direct evidence about Ben's desire because he was less than two years old at the time of trial. *See In re N.S.G.*, 235 S.W.3d 358, 369 (Tex. App.—Texarkana 2007, no pet.) (involving a twenty-two-month-old child at time of trial). Testimony from the child advocate and foster parent indicated that Ben has been in the same foster home since his removal at two months old, does not have any special needs, is meeting all developmental milestones, and is receiving appropriate therapies. According to the child advocate, Ben has bonded with his foster mother, who has confirmed a willingness to continue to care for Ben emotionally, physically, and financially now and in the future. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the fact finder may consider that the children have bonded with the

foster family, are well-cared for by them, and have spent minimal time with [their] parent.").[9]

In contrast, both Mother and Father were incarcerated at the time of trial, leaving them unable to care for Ben. And Mother is subject to an order preventing her from caring for any children without the permission of ODHS, which ODHS had not given. Since Ben's birth, Mother has been on probation, violated her probation twice, and was incarcerated. Mother's inability to stay out of legal trouble evidences her inability to provide a stable home for Ben. Although Mother testified that she had secured a safe place for Ben to stay with someone she met from church before returning to Oregon for probation-related issues, the record contains conflicting information about whether that acquaintance was willing to care for Ben in the long term.

Additionally, although Mother completed court-ordered services intended to increase her stability and address harmful behaviors, other evidence supports at least an inference that she did not meaningfully engage with the therapeutic services. *Cf.*

---

[9] Mother and Father challenge whether there can be sufficient evidence that termination is in Ben's interest based on placement in a non-relative foster home when placement with a family member may be possible. However, placement with a relative is not a required step for the Department. *See Rogers v. Dep't of Fam. & Protective Servs.*, 175 S.W.3d 370, 379 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (no duty to place child with relative before termination of parental rights). The trial court's determination of where a child should be placed is a factor in determining the child's best interest, but the fact that placement may be with non-relatives is not a bar to termination. *See In re J.D.*, No. 06-18-00105-CV, 2019 WL 1302932, at *9 (Tex. App.—Texarkana Mar. 22, 2019, no pet.) (mem. op.).

45

*In re S.R.*, 452 S.W.3d at 367 (considering parent's failure to appreciate need for treatment to combat history of mental instability and explaining trier of fact could thus infer that parent's mental-health issues would likely continue and further jeopardize children's well-being); *In re E.R.G.*, No. 11-20-00248-CV, 2021 WL 1807332, at *3 (Tex. App.—Eastland May 6, 2021, no pet.) (mem. op.) (parent's failure to seek treatment or properly take medication for mental-health issues may endanger child's physical or emotional wellbeing). At trial, she refused to acknowledge that she had physically abused Zachary or mistreated Kamryn.

For Father's part, he has never met Ben but expressed a desire to parent him. Father testified that he maintains relationships with his other children and, when not incarcerated, has shared custody of them or has been their primary parent. Father testified that even while he has been incarcerated, he has stayed in contact and involved with his other children. As evidence of his ability to meet Ben's future needs, Father points to his testimony that he has assumed custody of his other children when their other parent failed—such as when one daughter was abandoned by her mother at a juvenile facility, after which he participated in a Nevada CPS case and was deemed a fit parent—and cares for one child with special needs. Father also testified that he maintained consistent housing and employment before his incarceration and regularly used his earnings to support his children. Further, Father testified that he would have help from family setting up a household in Houston

upon his release and could return to the car dealership where he had previously worked in sales.

While not specifically tied to his testimony on his parenting abilities, the trial court expressed doubt on the record about Father's credibility and could have concluded that Father's aspirations for himself after his release were doubtful given his willingness to falsify documents or testimony before the court. Father also failed to recognize that instability and potential danger to Ben resulting from the history of violence between Father and Mother and between Mother and others when he opined that Mother would be a safe parent.

Again, the record shows a pattern of domestic violence and instability for both Mother and Father, which the trial court could consider in assessing Ben's best interest. *See In re Z.L.W.*, No. 01-12-00736-CV, 2013 WL 396270, at *4 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) ("Evidence establishing one of the predicate acts under [TEX. FAM. CODE § 161.001(b)](1) may also be relevant to determining the best interest of the child."). That evidence is relevant, not only to Mother's and Father's parenting abilities and to the stability of the home they would provide, but also to the emotional and physical needs of Ben, now and in the future, and to the emotional and physical danger in which Ben could be placed, now and in the future. And as described, both Mother and Father have downplayed the risk of instability resulting from their respective histories of

47

domestic violence or other assaultive conduct, raising concerns for their ability to care for Ben.

Giving due consideration to the evidence, the trial court reasonably could have formed a firm belief or conviction about the truth of its findings that termination of Mother's and Father's parental rights is in Ben's best interest. *See In re N.S.G.*, 235 S.W.3d at 369–70 (concluding evidence was legally and factually sufficient to support a best-interest finding for child who was five days old when placed in care of others and was twenty-two months old at trial).

Therefore, we overrule Mother's and Father's respective fourth and fifth issues challenging the trial court's best-interest finding.

## Conservatorship of the Child

In their fifth and sixth issues, respectively, Mother and Father challenge the trial court's appointment of the Department as Ben's sole managing conservator. Because we have overruled Mother's and Father's challenges to the trial court's order terminating their parental rights, the order has divested Mother and Father of their legal rights and duties related to Ben's. *See* TEX. FAM. CODE § 161.206(b). Consequently, Mother and Father lack standing to challenge the portion of the order appointing the Department as Ben's sole managing conservator. *See In re R.J.*, 579 S.W.3d 97, 120–21 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (concluding father could not challenge the Department's appointment as sole managing

conservator after Court overruled father's challenge to the termination of his parental rights); *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (explaining the Department's appointment as sole managing conservator was a "consequence of termination" after overruling parent's challenge to a termination order).

We overrule Mother's fifth and Father's sixth issues.

## Conclusion

Having overruled the issues that are necessary to resolve Mother's and Father's appeals, we affirm the trial court's judgment terminating their parental rights.

Andrew Johnson
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.